**Electronically Filed
Intermediate Court of Appeals
29642
30-MAY-2012
08:04 AM**

NO. 29642

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

RHETT BRYANT, Plaintiff-Appellant, v.
PLEASANT TRAVEL SERVICE, a California Corporation,
doing business as ROYAL KONA RESORT, Defendant-Appellee

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 06-1-144K)

MEMORANDUM OPINION
(By:  Fujise, Presiding Judge, Leonard and Ginoza, JJ.)

Plaintiff-Appellant Rhett Bryant (Bryant) appeals from the February 6, 2009 Final Judgment in favor of Defendant-Appellee Pleasant Travel Service, doing business as Royal Kona Resort (Pleasant Travel), entered by the Circuit Court of the Third Circuit (circuit court).[1]  Bryant was injured while working as an employee of an independent contractor repairing an air conditioning unit on Pleasant Travel's premises.

We affirm the judgment to the extent that summary judgment was granted for Pleasant Travel on Bryant's theory of liability that Pleasant Travel retained control over the job site and as based on Michel v. Valdastri, Ltd., 59 Haw. 53, 575 P.2d 1299 (1978).  However, we vacate the judgment to the extent that summary judgment was granted for Pleasant Travel on Bryant's theory of liability under the peculiar risk doctrine.

---

[1]     The Honorable Ronald Ibarra presided.

## I. Background

### A. Factual Background

On September 27, 2004, Bryant was injured when debris flew from an air conditioning unit atop the Beach Building[2], one of three buildings at the Royal Kona Resort Hotel (Hotel), and hit him, injuring him and causing him to fall roughly eight feet from a ladder. Bryant, then 25, was employed by PRO Service, a staffing agency, and was lent to Air Conditioning Services (ACS) with whom Pleasant Travel contracted to service and repair the commercial air conditioners at the Hotel.[3] ACS and Pro Service are not parties to this lawsuit. At the time of the incident, the Hotel was owned, as it is now, by Pleasant Travel.

The air conditioning units on the Beach Building had been in service since 1967, when the Hotel first opened as the Kona Hilton. The air conditioning system in the building was comprised of two main parts: a chiller in the basement of the building, and two cooling towers on the roof. These cooling towers were made of plywood, although many cooling towers are constructed from metal. A cooling tower is essentially a large box, which encloses a fan and device similar to a car's radiator that circulates water over small wooden boards and allows the air to cool the water. The fan at the top of the unit pulls air into the cooling tower, cooling the water flowing over the boards inside. The cooled water is pumped to the chiller, located in the Hotel's basement and individual room air-conditioning units.

The uncontested evidence showed that, on the day of the incident, the cooling tower was in poor shape. A letter on ACS letterhead,[4] dated March 4, 2004, and addressed to Roy Lewi, Sr.

---

[2]    After a renovation in 2005, the Hotel renamed the Beach Building to the Lagoon Building. For the sake of consistency we refer to it as the Beach Building.

[3]    The evidence presented indicated that this contract was maintained for approximately seventeen years, however, the record does not contain a written contract between ACS and Pleasant Travel.

[4]    The final page of the letter is not in the record, so it is unclear who wrote the letter.

(Lewi), the foreman of the Hotel's engineering department, informed him that

- Both cooling towers [sic] tops need to be rebuilt at least for now so we can safely service the motor and fan assembly[;] existing tower condition is a safety hazard. Towers are at the end of their service life.

- North is electrically and mechanically failed at this time.

- Both fan shrouds need to be removed and new shrouds fabricated.

On the day of the incident, the north cooling tower on the Beach Building was missing a lid and shroud. The shroud was necessary for the air conditioning system to work efficiently, because without it, the heated air pushed out of the cooling tower would be drawn back into the cooling tower and recycled without dissipating the heat.

In July 15, 2004, Matthew J. Briley (Briley), the president of ACS, sent a letter to "Royal Kona Resort," which read:

It has been well documented that the service lives of the central plant equipment has been exceeded for quite some time. ACS has kept them operating more or less for the past few years in anticipation of complete replacement. We have provided various quotations and written narratives on the state of your central plant equipment and recommended courses of action. Communication received from Resort Management has at times indicated imminent availability of replacement funds and at other times directed the patching and mending of existing systems. Time quantification of additional life for these degraded components is precarious at best. There are limited repair options available to the specific components and catastrophic unit failure cannot be ruled out. It is our opinion that the vagaries of mechanical fortune have been on our side so far, but without a comprehensive plan to deal with the obsolescence of the equipment, these fortunes must run out eventually.

ACS will provide a reduced cost limited repair proposal as requested, however this proposal must be submitted with limited expectations as well. . . .

The letter then presented a "limited repair proposal [with limited expectations]" (brackets in original) that recommended that the cooling towers at the Beach Building be repaired immediately and replaced within 18 months.

It was not just the north tower on the Beach Building, which Bryant worked on, that was in disrepair. The south cooling

tower on the Beach Building, in fact, was in worse condition and had been shut down and removed from service, as only one cooling tower was needed to run the air conditioning. Pleasant Travel agreed to repair the north tower, after receiving a quote[5] to rebuild the top. Lewi testified that no one from the hotel "assess[ed] whether these cooling towers were safe to work on" because "that's why I had [Briley] to come in and see what he could do."

On the morning of the incident, Bryant and his co-worker Michael Glickstein (Glickstein) met at ACS's shop with Donny Andrade, the head of ACS's service division, who instructed them on what to do. According to Glickstein, the instructions were to "try to screw together the rotted portions of the unit that was falling apart and get this fan shroud on the top." He said:

> We were just trying to shore it up because the whole thing kind of shimmied and shook because everything was wet, the wood was wet, so it was kind of springy. And the whole thing kind of shook there, so we were trying to pull it together a little bit. . . . We were going to put a top on it and try to shore it up a little bit.

Glickstein and Bryant removed the deteriorated plywood, added wood 2x4s to the side walls of the cooling tower, and attached hinges to the 2x4s, which connected to a new lid. The lid consisted of a one-half inch thick piece of plywood, which Glickstein and Bryant purchased that morning from Home Depot. Glickstein cut out of the plywood a circular hole, approximately 54 inches in diameter, with a jigsaw. He and Bryant centered the hole in the lid over the fan, which was already shut off when they arrived on the roof, and placed a metal shroud that had been fabricated by ACS, also centering it over the hole. Glickstein said there was "half an inch, three-quarter of an inch from the

---

[5] There are several references to cost proposals and invoices for the project in the depositions of Lewi and Briley. In one proposal, dated "7/14," Briley gave a quote of "Beach building, two cooling towers, repair cost 14,500, and then revised cost of 7250 each." We presume this proposal was made in 2004, at roughly the same time Briley was advising that the cooling towers be replaced.

tip of the fan blade to the front top corner of the shroud, about an inch, half an inch to an inch in there all the way around." Bryant and Glickstein then secured the shroud to the plywood lid using between eight and sixteen screws.

After installing the lid and shroud, Glickstein and Bryant cleaned up their materials and Glickstein flipped a switch to turn the fan on. According to Glickstein, the fan made a noise, but "[n]o more funny than a fan spinning like that would normally make. I mean it made noise, a little commotion going on there, but it wasn't like vibrating like strange vibrations or it wasn't shaking apart or anything like that." He said, "[N]othing . . . made [me really] nervous at the time. The whole thing, it's flexible plywood, it's moving a little bit, but it didn't -- I think -- I wasn't scared or anything like that, didn't expect what happened to happen." Glickstein and Bryant climbed back on ladders, about six or eight feet tall, standing roughly chest-high next to the unit. The ladders had not been removed "in case we had to still do something. . . . [W]e were only going up to look, make sure -- I don't even know what we were looking for, to tell you the truth." Glickstein said the screws "looked fine" and the fan "seemed like it was rotating on the center, on an axis, steady." Glickstein and Bryant were there for no longer than 20 seconds when, according to Glickstein, "[a]ll of a sudden there was a bang and a flash, and it was that fast, boom, and [Bryant] was gone."

When Glickstein climbed down from his ladder, he saw Bryant lying on the ground curled in a ball, bleeding profusely from the neck, and his eye was swollen. The shroud was in pieces, "flung all about the roof," although some of the metal was still screwed to the plywood lid. Glickstein observed:

> [T]he pieces of the shroud were all over the place, maybe tore the metal into four or five pieces, shredded it like paper. You could see the fan blade was actually -- there was a mark where the fan caught the shroud and chopped into it. And I guess that's where it caught on it and ripped it loose.

In a deposition, Glickstein testified that he thought the cooling tower "needed more than just what we were doing" and had he directed the repairs, he "would have tried to stiffen up the original plywood, maybe put like a two-foot band around the outside of it or something just to strengthen it a little bit." He said:

> I would have been happier putting a little more on the outside because the way we screwed the 2x4s on, we were screwing it onto the rotted wood.
>
> So basically, if you would have yanked on it, it probably would have just pulled the screws right through the rotted wood. But if I had put a band on the outside of it, it would have tied it all together, hold that piece in there.

When asked whether the fan could have sucked the metal shroud in, Glickstein agreed it was possible and explained:

> [The fan] is creating low pressure. I didn't see it suck the shroud in or anything, but it could have also -- the top could have moved down.
>
> [PLEASANT TRAVEL'S ATTORNEY]: The top that you installed, is that what you're talking about?
>
> [GLICKSTEIN]: Yeah, it's only half-inch plywood, and with your pressure differential the outside air being more pressure that [sic] inside where the fan is flowing air out, the outside air is pushing every direction, five directions on it.
>
> I didn't see it move or anything, but it wouldn't have to be visible. Obviously, something moved because it caught the fan shroud.
>
>         . . . .
>
> [BRYANT'S ATTORNEY]: So how could the fan then suck in?
>
> [GLICKSTEIN]: Well, if the top of the unit it's sitting on is bouncing up and down and the shroud is moving up and down this way, if it goes -- theoretically, if it went below the fan, it's in a low pressure now. Instead of being blown out, it's going to come back in.
>
> [BRYANT'S ATTORNEY]: I see.
>
> [GLICKSTEIN]: I would think that would take a lot of movement. I don't think it had that much movement, eight or ten inches. It may have had a half-inch worth of movement, something like that. The whole thing is vibrating. It's a 30-pound fan.

Others speculated that the design and manufacture of the shroud contributed to the accident. Lewi testified the

shroud was made of 18 or 20 gauge steel, thinner than the fiberglass used on the other cooling tower on the Beach Building, and "real flimsy compared to the old style of fiberglass." Lewi said in his experience, he believed shrouds were typically made of fiberglass. Michael Loando, ACS's supervisor at the Hotel, testified that he did not think the metal shroud was "the right fix" because "[i]t looked flimsy." He opined that the sheet metal shroud "would wave compared to this fiberglass" which, although thicker than the sheet metal, was light and "more rigid."

Lewi testified that ACS did not consult with him about what type of fan shroud to use, that he did not direct ACS to fabricate the shroud nor instruct ACS on whether to install a new plywood top. He said: "I left it up to ACS."

B. Procedural history

Bryant's complaint, filed on September 21, 2006, alleged that Pleasant Travel violated its duty to "maintain, inspect, and keep the air conditioning unit and cooling tower in a reasonably safe condition" and was negligent in designing and constructing the cooling tower's components.

Bryant's complaint alleged that he sustained a number of injuries, including a nine-centimeter long laceration to his neck, spine injury, brain injuries, a broken nose and other facial fractures, permanent hearing loss in his left ear, and damage to his left eye. When being deposed, Bryant could not remember many of the details of the day, before and after the incident.

Pleasant Travel moved for summary judgment, arguing that Bryant was an employee of ACS, and ACS "exercised complete direction or control over the work performed[.]" Pleasant Travel further argued that although there was an exception to the non-liability rule for employers of independent contractors where there was a "peculiar risk" of harm or a "special danger," such an exception did not apply in this case.

7

Bryant responded that Pleasant Travel controlled the work site, according to deposition testimony from Lewi who said he "oversaw" the ACS employees at the Hotel. However, the deposition attached to Bryant's memorandum in opposition to summary judgment also included the following questioning:

> Q [BRYANT'S ATTORNEY]: Would you ever go up on the roof when the contractor was there? . . . So would you ever go up there and observe what they were doing?
>
> A [LEWI]: When they're working on something?
>
> Q. Yes.
>
> A. No.
>
> Q. Why is that?
>
> A. I don't want to interfere with their expertise. I don't want to see something that --
>
> Q. You might question?
>
> A. Yeah. So I'll leave it up to them and they'll call me when they're done, then I'll do a check.
>
> Q. And by a check, you would go up and you'd look at the end of the day what work had been done?
>
> A. Yeah, whatever they had written down, if they needed a 2x10, so many 2x10s, that's what I'm getting charged for, so much plywood, metal, anything and everything. They can always make mistake. I was getting to the point where they was charging me for every nut, wire nuts and everything, so I didn't bother with that. I was about to open up the box and look at that as all that big stuff.
>
> Q. I see. So if you're getting charged for 2x4s you want to see that they're used?
>
> A. They used the amount they said they used.
>
> Q. Right.

On the issue of peculiar risk, Bryant argued that the peculiar risk was caused by the "unusually poor condition of the cooling tower."

The circuit court entered an order granting Pleasant Travel's summary judgment motion on January 16, 2009 and this timely appeal followed.

## II. Discussion

Bryant challenges the circuit court's entry of summary judgment because a jury should have determined genuine issues of

material fact as to "whether the Peculiar Risk Doctrine applied to the facts of the present case"; "whether [Pleasant Travel] exercised sufficient control over the job[]site"; and whether Bryant "was injured by a dangerous condition arising from or intimately connected to the work [he] was hired to perform." The appellate court reviews "the circuit court's grant or denial of summary judgment de novo." Querubin v. Thronas, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005).

Bryant's initial complaint against Pleasant Travel was for negligence. It is well-established that the elements of a negligence claim are:

> 1. A duty, or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks;
>
> 2. A failure on the defendant's part to conform to the standard required: a breach of the duty . . . ;
>
> 3. A reasonably close causal connection between the conduct and the resulting injury. . . .; and
>
> 4. Actual loss or damage resulting to the interests of another. . . .

Knodle v. Waikiki Gateway Hotel, Inc. 69 Haw. 376, 384-85, 742 P.2d 377, 383 (1987) (quoting W.P. Keeton, Prosser and Keeton on the Law of Torts § 30, at 164-65 (5th ed. 1984)) (brackets omitted) (alterations in original).

Whether a defendant owes a duty to the plaintiff is a question of law. Wagatsuma v. Patch, 10 Haw. App. 547, 569, 879 P.2d 572, 585 (1994); Hayes v. Nagata, 68 Haw. 662, 666, 730 P.2d 914, 916 (1986). However, "whether or not the defendant's actions violate the required duty . . . is a question of fact." Jones v. Chevron U.S.A., Inc., 718 P.2d 890, 897 (Wyo. 1986). See also Wagatsuma, 10 Haw. App at 574, 879 P.2d at 587 ("The issue of breach of duty . . . is ordinarily one for the jury.").

Bryant based his claim against Pleasant Travel on two theories: Pleasant Travel as the employer of an independent contractor and as owner of the premises where the injury occurred.

A.    Pleasant Travel's duty as employer of an independent
      contractor.

As a general rule, "the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants." Restatement (Second) of Torts § 409 (1965) (Restatement). Hawai'i applies the general rule. See, e.g., Taira v. Oahu Sugar Co., Ltd., 1 Haw. App. 208, 211-12, 616 P.2d 1026, 1029-30 (1980). See also Fraser v. Morrison, 39 Haw. 370, 376, 1952 WL 7360 at *4 (Haw. Terr. 1952) ("A collection agency is an independent contractor for whose act the creditor is not responsible."), abrogated on other grounds by, Hac v. Univ. of Hawaii, 105 Hawai'i 92, 92, 73 P.3d 46, 46 (2003). Bryant relies on two of the many exceptions to the rule: the "peculiar risk" exception and the "retained control" exception.

1.    "Peculiar Risk" Exception

Hawai'i's courts have adopted the peculiar risk exception as explained in the Restatement §§ 416 and 427. Makaneole v. Gampon, 70 Haw. 501, 504, 777 P.2d 1183, 1185 (1989) (Makaneole II). These sections provide:

§ 416. Work Dangerous In Absence Of Special Precautions

One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

§ 427. Negligence As To Danger Inherent In The Work

One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

Restatement §§ 416 and 427. Both sections are applicable to this case. Also applicable is Restatement § 413, which other

10

jurisdictions have cited to define the doctrine.  See, e.g., Am.
States Ins. Co. v. Progressive Cas. Ins. Co., 102 Cal. Rptr. 3d
591, 599 (Cal. Ct. App. 2009).  Restatement § 413 reads:

> 413. Duty To Provide For Taking Of Precautions Against
> Dangers Involved In Work Entrusted To Contractor
>
> One who employs an independent contractor to do work
> which the employer should recognize as likely to create,
> during its progress, a peculiar unreasonable risk of
> physical harm to others unless special precautions are
> taken, is subject to liability for physical harm caused to
> them by the absence of such precautions if the employer
>
> (a) fails to provide in the contract that the
> contractor shall take such precautions, or
>
> (b) fails to exercise reasonable care to provide in
> some other manner for the taking of such precautions.

Restatement § 413.[6]  Section 416 is more commonly applied when an
employer "should anticipate the need for some specific
precaution," whereas the rule in Section 427 applies where "the
danger involved in the work calls for a number of precautions, or
involves a number of possible hazards[.]"  Restatement § 416
cmt. a.

The commentary to Restatement § 413 explains the
meaning of "peculiar risk" as a

> special risk[], peculiar to the work to be done, and arising
> out of its character, or out of the place where it is to be
> done, against which a reasonable man would recognize the
> necessity of taking special precautions.  The situation is
> one in which a risk is created which is not a normal,
> routine matter of customary human activity, such as driving
> an automobile, but is rather a special danger to those in
> the vicinity, arising out of the particular situation
> created, and calling for special precautions.  "Peculiar"
> does not mean that the risk must be one which is abnormal to
> the type of work done, or that it must be an abnormally
> great risk.  It has reference only to a special,
> recognizable danger arising out of the work itself.

Restatement § 413 cmt. b.  In order for the exception to apply,
the contractor's work does not have to be "an extra-hazardous or

---

[6]      Restatement Section 413 differs from Section 416 in that in the
former no precautionary measures have been provided for under the contract and
in the latter the precautionary measures have been accounted for by contract
but the contractor did not follow them, in which instance the contractor would
have a duty to indemnify the employer for liability caused by his negligence.
See Restatement § 416 cmt. c.  The terms of the contract between Pleasant
Travel and ACS are not in the record.

abnormally dangerous activity[.]" Restatement § 416 cmt. d. The peculiar risk exception requires that there is "some special hazard resulting from the nature of the work done, which calls for special precautions[,]" id., and "the contractor fail[s] to exercise reasonable care to take [those] adequate precautions." Restatement § 416 cmt. f. The commentary further explains that the peculiar risk doctrine

> is not concerned with the taking of routine precautions, of a kind which any careful contractor could reasonably be expected to take, against all of the ordinary and customary dangers which may arise in the course of the contemplated work. Such precautions are the responsibility of the contractor; and if the employer has exercised reasonable care to employ a contractor who is competent and careful, he is not required to provide, in the contract or otherwise, that the contractor shall take them.

Restatement § 413 cmt. b.

### a. Peculiarity of risk is a question of fact.

The peculiar risk doctrine is "unequivocally applicable to third persons who are not employees of a contractor[.]" Lindler v. District of Columbia, 502 F.2d 495, 498 (D.C. Cir. 1974). However, an "overwhelming majority of jurisdictions" have held that the peculiar risk doctrine could not apply in cases such as this, where the injured employee of an independent contractor sues his employer's employer. See Tauscher v. Puget Sound Power & Light Co., 635 P.2d 426, 429 & n.2 (Wash. 1981). See also Monk v. V.I. Water & Power Auth., 53 F.3d 1381, 1391 n.28 (3d Cir. 1995) (listing fourteen states that reject the doctrine and two that approve); Fleck v. ANG Coal Gasification Co., 522 N.W.2d 445, 450-51 (N.D. 1994) (collecting cases approving and disapproving of the doctrine); Clausen v. R.W. Gilbert Constr. Co., Inc., 309 N.W.2d 462, 466 n.1 (Iowa 1981) (same).

Nevertheless, in Makaneole II, the Hawai'i Supreme Court held that Restatement §§ 416 and 427 could be applied against a landowner that hired an independent contractor and the injured plaintiff was an employee of the contractor. Makaneole II, 70 Haw. at 507, 777 P.2d at 1187. The court relied on the

legislative history behind the "contractor clause" in Hawai'i's worker's compensation laws to conclude that "the owner of the premises was no longer a statutory employer exempted from suits for negligence under [HRS] § 386-5 [(the exclusive remedy provision)]." 70 Haw. at 507, 77 P.2d at 1187. Thus, we must determine whether the peculiar risk doctrine works to impose liability in this case.

In Hawai'i's most recent case on the peculiar risk doctrine, this court treated the question of whether a risk is "peculiar" as a question of fact. In Shaner, we rejected summary judgment in favor of defendant homeowners on the basis that the plaintiff, the personal representative of a deceased employee of a tree-removal company hired by the defendant homeowners, put forth evidence that raised a genuine issue of material fact as to whether the homeowners owed a duty to decedent. Shaner v. Kraus, 122 Hawai'i 351, 226 P.3d 521, No. 29379, 2010 WL 1056870 at *4 (App. Mar. 19, 2010) (mem. op.). Therefore, we must consider whether the record before us contains evidence sufficient to raise a genuine issue of material fact as to whether there was a peculiar risk inherent in Bryant's work. See Ek v. Herrington, 939 F.2d 839, 843 (9th Cir. 1991).

> **b.     Evidence was sufficient for trial on the peculiar risk issue.**

In Shaner, we addressed whether evidence regarding the employee's work was sufficient for a jury to consider whether a peculiar risk existed. Shaner, 2010 WL 1056870 at *4.[7] Shaner is distinguishable from this case because the decedent's work was near high-voltage electric lines, which has been recognized as "inherently dangerous." See, e.g., Paull v. Park County, 218

---

[7]     In Shaner, 2010 WL 1056870 at *2-4, we held that the plaintiff, the personal representative of an employee of a tree-removal company who was electrocuted when part of the crane he was riding in hit a live high-voltage wire, raised a triable issue of fact as to whether a peculiar risk existed where the plaintiff produced evidence that the homeowners had hired the contractor after a previous company refused to remove the trees because they were too close to high-voltage electrical lines and that decedent's company admitted it violated safety directives as specified in the crane manual.

P.3d 1198, 1208 (Mont. 2009) (listing some "inherently dangerous" activities, including blasting, pile driving, crop dusting, demolition, emission of noxious gases or fumes). Bryant does not cite, nor could we find, any case finding air-conditioning repair work in general or repairs made near a fan in particular to be inherently dangerous.

Bryant argues that the peculiar risk that he was exposed to was "the extremely poor and dilapidated condition of the wooden cooling tower," yet he does not suggest what precautions were necessary to ameliorate the risk posed by such conditions. However, Pleasant Travel's argument to the contrary is equally unpersuasive. Pleasant Travel relies on Glickstein's testimony that the work was "pretty simple" and there was "nothing unusual" about the work. The fact that the work was "pretty simple" is irrelevant, because the peculiar risk doctrine does not require that the work entail any "special skill" or care, rather "[i]t is sufficient that work of any kind involves a risk, recognizable in advance, of physical harm to others which is inherent in the work itself[.]" Restatement § 427 cmt. b (emphasis added).

### i. "Unusual" nature of Bryant's work

Hawai'i cases appear to leave it to a jury to decide whether the circumstances of a work site are unusual or extraordinary. For example, in Shaner, we remanded the case to consider the peculiar risk question, where there was evidence that the electrocution risk was a routine one for the deceased plaintiff's company, which specialized in removing trees near power lines, while another company had refused the project because of the location. 2010 WL 1056870 at *4.

In the case before us, the evidence was that the cooling tower was made of a different material from other cooling towers (wood, rather than metal), and that the wood was in particularly bad condition because the wood comprising it was "soggy and brittle at the same time, kind of squishy in some places and dry and crumbly in other places." Here, the evidence

14

was sufficient to raise a genuine question as to whether Bryant's work on the day of his injuries "involve[d] circumstances that are substantially out-of-the-ordinary." Ortiz v. Ra-El Dev. Corp., 528 A.2d 1355, 1358 (Pa. Super. Ct. 1987).

### ii. "Collateral negligence" in the "manner in which the work was done"

As noted above, the peculiar risk exception requires that the cause of the harm be the absence of "special precautions." See Restatement §§ 413, 416. Bryant's own brief suggests, under a different theory of liability, that the precaution which was missing but necessary here was a "lock-out, tag-out" procedure for re-starting the fan once repairs were complete and that this procedure should have required personnel to keep a safe distance from the air conditioning unit. Bryant's expert explained in a written report that Hawaii Occupational Safety and Health Law regulations provided a standard for "typical minimal lockout procedures," that Pleasant Travel did not have such procedures, and that such procedures would have prevented Bryant's injuries. This leads us to ask whether the failure to observe a standard safety procedure can serve as the basis of a peculiar risk claim.

Pleasant Travel's Answering Brief relies on cases that find, as a matter of law, no duty was owed to a independent contractor's employee who failed to follow recognized safety procedures. See Warnick v. Home Depot U.S.A., Inc., 516 F. Supp. 2d 459, 470 (E.D. Pa. 2007) (plaintiff failed to use a safety harness and fell through a ceiling); Hernandez v. Midwest Gas Co., 523 N.W.2d 300, 304-05 (Iowa Ct. App. 1994) (plaintiff failed to follow safety handbook, omitted "ordinary safety precautions," and was asphyxiated by natural gas); Sievers v. McClure, 746 P.2d 885, 886 (Alaska 1987) (plaintiff's decedent failed to use fall-prevention devices on an icy roof and fell to his death).

These cases and others discussing the "special precautions" requirement of the Restatement generally apply two arguments. The first is that where the safety precautions are well-recognized in the industry, the precautions are "routine" and cannot be "special" precautions within the meaning of the Restatement. See, e.g., PSI Energy, Inc. v. Roberts, 829 N.E.2d 943, 955-56 (Ind. 2005) (industry standards are applicable measures of the "routine precautions" that are the responsibility of the contractor), abrogated on other grounds by Helms v. Carmel High School Vocational Bldg. Trades Corp., 854 N.E.2d 345 (Ind. 2006). But see Beckman v. Butte-Silver Bow Cnty., 1 P.3d 348, 353 (Mont. 2000) (overruling prior decisions that "misinterpreted the interplay of 'ordinary' or standard and 'special precautions'" and holding that precautions that "although arguably standard with regard to the risk posed, are special in that they are designed to protect workers from the unreasonable, extraordinary, and unusual risks associated with [their work].") The second concludes that a party's failure to follow recognizable safety procedures constitutes "collateral" or "causal negligence" and therefore the risk did not "arise out of" the independent contractor's work. See, e.g., Hernandez, 523 N.W.2d at 304 ("[T]he term ['peculiar risk'] means more than danger that arises from the collateral negligence of persons engaged in the activity or danger which arises solely from the method of the activities' performance.").

Pleasant Travel's Answering Brief emphasizes the "manner in which the work was done" in its description of cases, suggesting that it intended to argue that Bryant and ACS's collateral negligence prohibited application of the peculiar risk doctrine. Indeed, the peculiar risk doctrine does not apply where the cause of the harm was an independent contractor's "collateral negligence." Restatement § 427 cmt. d. (referring to the definition of collateral negligence stated in Section 426). Section 426 defines collateral or causal negligence as that which "consists solely in the improper manner in which [the contractor]

does the work, and . . . creates a risk of such harm which is not inherent in or normal to the work, and . . . the employer had no reason to contemplate the contractor's negligence when the contract was made."

Some courts have found that violations of recognized safety procedures qualify as collateral negligence. See Warnick, 516 F. Supp. 2d at 469-70 ("Violations of safety conditions -- whether by the employee or his employer, the contractor -- are not a basis for invoking the doctrine."). See also Motter v. Meadows Ltd. P'ship, 680 A.2d 887, 892 (Pa. Super. Ct. 1996) (finding no peculiar risk in trenching operation where danger was caused by "failure to abide by the OSHA rules and regulations, and not the nature of the soil"); Nagy v. Consumers Power Co., 2001 WL 672171 at *2 (Mich. Ct. App. 2001) ("In cases where the injury results because well-recognized safety measures are not taken by the workers, the risk is not inherent to the work being done but rather is created by the failure to take ordinary precautions.").

The California Supreme Court, however, has said "it is often difficult to distinguish those risks that are inherent in the work from those that are collateral, and the line to be drawn between the two types of risks is 'shadowy.'" Toland v. Dunland Hous. Grp., Inc., 955 P.2d 504, 508 (Cal. 1998) (quoting Privette v. Superior Court of Santa Clara Cnty., 854 P.2d 721, 726 (Cal. 1993)) (internal quotation marks omitted). Another court explained the distinction in this way:

> In the one case the doing of the work creates danger and requires active care to counteract the danger. In the other there is no danger unless created by [collateral] negligence. The one starts with danger and requires preventive care to make safety, while the other starts with safety and requires negligence to make danger.

Lunde v. Winnebago Indus. Inc., 299 N.W.2d 473, 476-77 (Iowa 1980) (quoting Carson v. Blodgett Constr. Co., 174 S.W. 447, 448 (Mo. Ct. App. 1915)).

"The question of whether a contractor's negligence was 'collateral,' like the related issue of whether there was a

peculiar risk inherent in the work being performed, is generally an issue for the trier of fact to resolve." Pusey v. Bator, 762 N.E.2d 968, 978 (Ohio 2002) (Cook, J., concurring) (citing Caudel v. E. Bay Muni. Util. Dist., 211 Cal. Rptr. 222, 227 (Cal. Ct. App. 1985)). Based on Glickstein's testimony that he "[didn't] know what [they] were looking for" when he and Bryant ascended the ladders next to the cooling tower after installing the shroud and from Loando's testimony that Bryant and Glickstein were supposed to call him to "start it up", it can be inferred that Bryant was not required to put himself in the position where he was injured. However, a reasonable juror could also conclude that it is not improper or unforeseeable that a worker tasked with installing a piece of equipment would check the work after completing the task, and that in order to do so, he would stand within a zone where he would be injured if the equipment failed. If we were to use the test given in Lunde, there would be sufficient evidence that Bryant's work "start[ed] with danger and require[d] preventative care," given Briley's warning that the tower posed a "safety hazard." Moreover, reasonable minds could disagree whether Bryant's actions "create[d] a risk of such harm which is not inherent in or normal to the work," which Pleasant Travel "had no reason to contemplate . . . when the contract was made." Restatement § 426. Therefore, summary judgment in Pleasant Travel's favor based on its collateral negligence theory was inappropriate.

### c. Conclusion

Bryant has raised some genuine questions as to the nature of the risk in the work Bryant was hired to perform. A jury should be permitted to consider the question of whether the cooling tower project posed an "ordinary and customary danger" to Bryant and whether the failure of Bryant to follow safety procedures when starting the cooling tower's fan constituted a "collateral" risk. Summary judgment in favor of Pleasant Travel on this ground was inappropriate.

18

## 2. "Retained Control" Exception

Another recognized exception to the general rule against assigning liability to the hiring employer of an independent contractor for the contractor's employees' negligence depends on whether the hiring employer retains control over how the independent contractor performed the work. See Taira, 1 Haw. App. at 211-12, 616 P.2d at 1029-30.

Bryant argues that "a jury should be allowed to decide if Defendant . . . is subject to liability under the retained control exception." Indeed, we have recognized that "[t]he nature and extent of control by an employer of an independent contractor of the independent contractor's performance of work contracted for is a question of fact, which is to be determined by a consideration of all the circumstances[.]" Makaneole v. Gampon, 7 Haw. App. 448, 455, 776 P.2d 402, 407 (1989) (Makaneole I), (citation omitted), aff'd in part and rev'd in part, Makaneole II . In order for control of a job site to be considered "retained,"

> [i]t is not enough that [the hiring employer] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

Id. at 454-55. 776 P.2d at 407 (quoting Restatement § 414 cmt. c).

We acknowledged that jurisdictions are split over "whether the employer's liability must be based upon specific control over the activity out of which the injury arose, or whether proof of general control of the work premises is sufficient." Id. at 457, 776 P.2d at 408. Bryant here argues for the broader scope, requiring only control over the work site, i.e., the Hotel property as a whole. Makaneole I did not decide whether the premises owner's control needed to extend to the

independent contractor's specific activity or the premises generally, but instead adopted the rule, stated in <u>Jones</u>, that

> an owner of a work site who retains the right to direct the manner of an independent contractor's performance or assumes affirmative duties with respect to safety owes a duty of reasonable care to an employee of the independent contractor even if the employee is injured doing the very work the contractor was hired to perform.

<u>Id.</u> at 458, 776 P.2d at 409 (citing <u>Jones</u>, 718 P.2d at 896).

Bryant argues that the following facts demonstrate Pleasant Travel's control over the work site: (1) Pleasant Travel's foreman, Roy Lewi, says he "oversaw" ACS workers when they worked at the Hotel; (2) Lewi and Pleasant Travel's engineering and maintenance staff did "trouble-shooting" of the air conditioning system; (3) Lewi approached ACS's president about giving the Hotel workers classes on air conditioning; and (4) a Hotel worker "shadowed" an ACS worker to learn more about the air conditioning system. Even when construed in the light most favorable to Bryant, these facts are insufficient to establish that Pleasant Travel "retain[ed] the right to direct the manner of an independent contractor's performance or assume[d] affirmative duties with respect to safety." <u>Id.</u> In fact, Lewi stated in the deposition submitted by Bryant that when it came to how air conditioning repairs were made, he "left it up to ACS."

Bryant's Opening Brief cites three cases relevant to the control issue: <u>Taira</u>, <u>Messier</u>, and <u>Makaneole I</u>. In <u>Taira</u>, this court concluded that the defendant property owner had not retained control because the contract between the defendant and the independent contractor gave the contractor "complete responsibility for making the necessary repairs and for determining how to make those repairs" and the independent contractor directed his employee on how to complete the task that ultimately injured the employee. <u>Taira</u>, 1 Haw. App. at 212, 616 P.2d at 1029. In <u>Messier</u>, a product defect case, this court reversed a summary judgment ruling in favor of a defendant property owner where there was evidence that the defendant

required a particular material during construction, approved the design of the allegedly defective building element that injured the plaintiff, and had an employee on the job site daily to oversee construction. <u>Messier v. Ass'n of Apt. Owners of Mt. Terrace</u>, 6 Haw. App. 525, 537, 735 P.2d 939, 948 (1987). In <u>Makaneole I</u>, we reversed a summary judgment ruling in favor of the defendant because the plaintiff established that the defendant's representative maintained an office at the project site, inspected the progress, and took on a number of responsibilities, including reporting subcontractors' substandard work to the independent contractor. 7 Haw. App. at 456-57, 775 P.2d at 408. The facts of this case are clearly closer to <u>Taira</u> than <u>Messier</u> or <u>Makaneole I</u>.

Here, the undisputed evidence is that not one of Pleasant Travel's employees came to the roof that day to supervise the work, that Bryant and Glickstein spoke only to one of Pleasant Travel's employees that day prior to the accident to get the key to the roof, and that Donny Andrade, an ACS supervisor and not an agent of the Pleasant Travel, instructed Bryant and Glickstein on how to make the repairs. Moreover, Lewi indicated that ACS chose what material and what design was used on the replacement shroud and top. Lewi testified that he did not generally observe what ACS contractors did, other than checking at the end of the day to ensure that the work used the materials Pleasant Travel was billed for. In conclusion, even when viewed in the light most favorable to Bryant, the evidence is insufficient to support a finding that Pleasant Travel retained control over Bryant's work.

Bryant points to two facts in arguing that Pleasant Travel was negligent in controlling the job site: (1) "its admitted failure to assess whether the equipment was safe to be worked on at all" after ACS notified it that the cooling tower posed a safety hazard and (2) repeated violations of workplace safety rules regarding the "'lock-out, tag-out' of energized equipment such as the A/C cooling tower's fan." Although

21

"violations of pertinent provisions of . . . the Occupational Safety and Health Law (OSHL), HRS Chapter 396 . . . [are] admissible as evidence of negligence," Michel v. Valdastri, Ltd., 59 Haw. 53, 55, 575 P.2d 1299, 1301 (1978), the issue of negligence would only arise after Bryant makes a prima facie showing that Pleasant Travel retained control over job site. See Makaneole I, 7 Haw. App. at 459, 775 P.2d at 409. Where there is no evidence that Pleasant Travel retained control over the work contracted to ACS such that Pleasant Travel had a duty to Bryant, these facts regarding Pleasant Travel's alleged negligence in performing that duty are not relevant.

B.  Pleasant Travel's liability as premise owner

HRS § 396-6(a) (1993) codifies the duty of every employer to "furnish to each of the employer's employees employment and a place of employment which are safe as well as free from recognized hazards." This "duty of the employer to provide a safe place to work runs to whomever he requires or permits to perform work on his premises" and does not depend on an employer-employee relationship. Michel, 59 Haw. at 57, 575 P.2d at 1301-02. However, "the employer-owner of the premises is nevertheless under no duty to protect the employee from dangerous conditions arising from or intimately connected with the particular defect in the premises or in the machinery which he has been hired to abate or repair." Id. at 57, 575 P.2d at 1302. See HRS § 396-6(a) (exception to "safe place of employment rule" made where employee sent to place for the "specific purpose of abating said hazard").

A contractor is presumed to have assumed the risks involved in making repairs. Hammond v. City of El Dorado Springs, 242 S.W.2d 479, 483 (Mo. 1951). See Hines v. Martel Tel. Co., 255 N.W. 233, 235 (Neb. 1934) ("[A] person who contracts to perform labor or services for another is presumed to have so contracted in view of the risks ordinarily incident to or connected with the employment. He assumes all such risks.") (internal quotation marks and citation omitted); E.H. Schopler,

Annotation, <u>Duty of owner of premises to furnish independent</u> <u>contractor or his employee a safe place of work, where contract</u> <u>is for repairs</u>, 31 A.L.R.2d 1382 (1953) ("the owner is not liable for . . . injury of an independent contractor or one of his employees resulting from dangers which the contractor, as an expert, has known, or as to which he and his employees 'assumed the risk.'"). Thus, "the owner or occupier [of premises] is under no duty to protect [an independent contractor's employees] against risks arising from or intimately connected with defects of the premises, or of machinery or appliances located thereon, which the contractor has undertaken to repair." 31 A.L.R.2d 1381-82 (1953).

Bryant argues that the jury should have been allowed to consider whether he "was injured by the exact instrumentality that ACS was called to repair." Bryant argues that he was "simply tasked to replace the rotted wood on the top of the large cooling tower, and to replace the old shroud around the fan" but "not called to work on the fan itself or on the cooling tower as a whole." If the case were to proceed to trial, he "would have argued that the cause of the accident was the unexpected lateral movement of the fan due to the overall instability of the rotted cooling tower." Bryant theorizes on appeal that "[b]ecause of the unusually poor condition of the wooden cooling tower, the vertical shaft of the fan moved enough . . . to come in contact with the new shroud[.]"

Bryant's argument fails for a number of reasons. First, it is clear that the fan is not a separate instrumentality from that which he was called to repair. On this point, Bryant attempts to draw the analogy to <u>Michel v. Valdastri</u>. In <u>Michel</u>, the plaintiff was hired to repair a trolley mechanism on a crane and was allegedly injured when the crane's braking system, which the plaintiff was not hired to repair, failed. 59 Haw. at 55, 575 P.2d at 1301. In <u>Michel</u>, it could be inferred that the brake and the trolley, although attached to the same crane, operated independently of each other; that is, if one was inoperable it

had no effect on the other.  See id. at 54-55, 575 P.2d at 1300-01.  To the contrary here, the record establishes that the shroud was necessary to make the fan work efficiently.  Thus, it can be said that by replacing the missing shroud, Bryant and Glickstein were repairing[8] the fan as well.  Furthermore, although Bryant "maintains that the defective condition that caused the accident was the fan and the overall instability of the large wooden cooling tower," he offers no explanation how this "instability" existed after he removed rotted wood from the tower's top and added 2x4s for stability.  Accordingly, we cannot agree the fan was not "intimately connected" to the repairs Bryant made.

Second, even if we were to assume that the fan and shroud were not "intimately connected," Bryant puts forth no evidence that a defect in the fan alone caused the incident.  Glickstein's testimony supports the theory that the shroud was "sucked into" the fan, and the fan "chopped it," but there is no credible evidence in the record to support the alternate theory that the fan shaft moved or that the fan itself was otherwise defective so as to catch and shred the shroud.  "A party opposing a motion for summary judgment cannot discharge his or her burden by alleging conclusions, 'nor is [the party] entitled to a trial on the basis of a hope that [the party] can produce some evidence at that time.'"  Henderson v. Prof'l Coatings Corp., 72 Haw. 387, 401, 819 P.2d 84, 92 (1991) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2727 (2d ed. 1983)).

Even assuming the fan was not connected to the instrumentality he was hired to repair, without evidence that movement of the fan alone caused the accident, Bryant failed to "set forth specific facts showing that there is a genuine issue

---

[8]     "Repair is restoration by renewal or replacement of subsidiary parts of a whole. . . . The word repair contemplates an existing structure or thing which has become imperfect by reason of the elements or otherwise, and to repair we restore or supply in the original structure that which is lost, destroyed or missing."  Hammond, 242 S.W.2d at 482 (internal quotation marks omitted).

for trial" regarding whether the cause of his injuries were caused by something other than the instrumentality he was hired to repair.  Hawai'i Rules of Civil Procedure Rule 56(e).  Therefore, summary judgment in favor of Pleasant Travel on this basis was not erroneous.

### III. Conclusion

For the reasons given in Part II.A.1 above related to the peculiar risk exception, summary judgment in Pleasant Travel's favor was inappropriate.  Therefore, the February 6, 2009 Final Judgment of the Circuit Court of the Third Circuit is vacated and this case is remanded for further proceedings consistent with this memorandum opinion.

DATED: Honolulu, Hawai'i, May 30, 2012.

On the briefs:

Ian L. Mattoch and
Daniel P. Kirley,
for Plaintiff-Appellant.

Presiding Judge

J. Patrick Gallagher and
Jeffrey Y. Higashi,
(Henderson Gallagher & Kane),
for Defendant-Appellee.

Associate Judge

Associate Judge